UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Evergreen Recovery Inc., Evergreen Mental Health Services Inc., Ethos Recovery Clinic Inc., Second Chances Recovery Housing Inc., Second Chances Sober Living, Inc., David Backus, Shawn Grygo, and Shantel Magadanz,<br><br>　　　　　Defendants. | Court File No. 24-cv-2944 (KMM/JFD)<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL DISTRIBUTION OF RECEIVERSHIP FUNDS** |

The Receiver submits this memorandum in support of the Motion For Partial Distribution of Receivership Funds (the "Motion"). By this Motion, the Receiver is requesting Court approval to make a partial distribution of the funds held by the Receiver (the "Receivership Funds").

**RELEVANT FACTS**

**A.    Limited Receivership Funds Are Available and Claims Greatly Exceed Assets.**

Receiver Ranelle Leier (the "Receiver") was appointed on August 9, 2024 pursuant to the Court's Order for Entry of Preliminary Injunction, Order Appointing Receiver, and Other Equitable Relief [Doc. No. 44] ("Receivership Order"). She was appointed as the Receiver for Defendants Evergreen Recovery Inc., Evergreen Mental Health Services Inc., Ethos Recovery Clinic Inc., Second Chances Recovery Housing Inc., and Second Chances Sober Living, Inc. (collectively, the "Receivership Entities").

As noted in the Receiver's Status Report [Doc. No. 61], the Receiver has attempted to identify and secure the assets that are subject to the Receivership Order. The Receiver has also worked with the U.S. Attorney's Office to identify any bank accounts or liquid assets subject to the Receivership Order. All funds held in the name of the Receivership Entities were transferred into a new bank account controlled solely by the Receiver. The current balance of that bank account, *i.e.*, the Receivership Funds, is approximately $555,000.00. Based upon the Receiver's investigation and conversations with the U.S. Attorney's Office, the Receiver does not believe significant additional funds will be recovered that will be subject to the Receivership Order.

To date, the Receiver has not paid any vendors or other creditor claims related to the Receivership Entities that were either incurred or owed prior to her appointment. Instead, the only payments from the Receivership Funds have been: (1) monthly payment of the mortgage on the primary residence of Shawn Grygo and David Backus pursuant to Section IV.B.9 of the Receivership Order, and (2) payment of fees owed to the payroll company that was engaged by the Receiver to prepare 2024 W-2 tax forms for the employees of the Receivership Entities.

As noted in the Status Report, the Receiver has compiled and continues to compile information related to the debts and other outstanding payment obligations of the Receivership Entities. The debts owed by the Receivership Entities far outweigh the Receivership Funds. Given the large delta between available assets and claimed liabilities, at this point, the Receiver has not expended the time and resources necessary to conduct an in-depth review of these claims to verify their complete accuracy.

**B.     The Minnesota Department of Labor and Industry Conducted an Audit Related to Unpaid Employee Wages.**

By this Motion, the Receiver is proposing that a portion of the Receivership Funds be distributed at this time to the former employees of the Receivership Entities as partial payment of unpaid wages.

In response to claims of unpaid employee wages, the Minnesota Department of Labor and Industry ("MDLI") conducted an audit of certain Receivership Entities. After its investigation concluded, MDLI issued a draft Compliance Order ("Compliance Order") against all of the Receivership Entities except for Second Chances Recovery Housing Inc.[1] and against Defendants Grygo and Backus, individually (collectively, "Respondents"). The Compliance Order concludes that Respondents failed to pay wages owed to its employees for the pay periods starting June 2, 2024 and concluding August 10, 2024. As part of its audit, MDLI calculated the amount of back wages owed to Respondents' employees. The Compliance Order sets for the back wages, along with compensatory damages owed to certain employees for unpaid reimbursements, liquidated damages, and average daily earnings penalties. The MDLI also assessed a civil penalty against Respondents. These calculations are attached as exhibits to the Compliance Order as Statement of Back Wages and Statement of Damages and Penalties.

The Receiver and Defendants Shawn Grygo and David Backus were served with copies of the Compliance Order. Defendant Grygo timely submitted an objection to the

---

[1]     The Receiver does not believe there are any employees of Second Chance Recovery Housing Inc. that were not also employed by one of the other Receivership Entities.

3

Compliance Order. Thereafter, MDLI issued amended exhibits to its Compliance Order (Amended Statement of Back Wages and Amended Statement of Damages and Penalties) reducing the back wages, damages, and penalties as to one employee to zero, but did not amended its Compliance Order. The amended total back wages calculated by MDLI is $1,160,956.85.[2] The amount of back wages owed to employees as set forth in the Amended Statement of Back Wages is more than double the amount of money currently in the Receivership account.[3]

**C.     The Receiver's Proposed Partial Distribution Plan.**

The Receiver is proposing that the Receivership Entities' employees receive a partial distribution of unpaid wages before any other creditors of the Receivership Entities are paid. While there are many other additional creditors, the Receiver is requesting that only employees are allowed to participate in this initial distribution.

---

[2]     The MLDI Compliance Order also assessed liquidated damages (equal to the back wages amount), compensatory damages, and average daily wage penalty in the amount of $1,750,824.88.

[3]     The MDLI Compliance Order is not yet a final order because one of the Respondents (Defendant Grygo) submitted an objection. As such, the Compliance Order and its exhibits are still part of an active investigation file and classified as protected nonpublic data under the Minnesota Government Data Practices Act, Minn. Stat. § 13.39. While the MDLI amended its calculations of the amount of back wage, damages, and penalties owed by Respondents, it only amended the exhibits to the Compliance Order, *i.e.*, it prepared an Amended Statement of Back Wages and Amended Statement of Damages and Penalties, but did not serve an amended Compliance Order or otherwise update the back wages and other damages and penalties numbers in the Compliance Order. Per the MDLI, the Amended Exhibit 1 – Statement of Back Wages and the Amended Exhibit 2 – Statement of Damages and Penalties both contain data classified as private or confidential under the Minnesota Government Data Practices Act, Minn. Stat. § 13.01, *et seq.* As such, the Receiver is submitting the Compliance Order and Amended Exhibits 1 and 2 to the Court only for *in camera* review.

The Receiver proposes that the total amount of funds distributed as part of this proposed partial distribution is $250,000.00. Except as set forth below, all employees of the Evergreen Entities with unpaid wages, as listed on Exhibit 1 to the Declaration of Ranelle Leier, filed herewith, would be entitled to participate in the distribution. The following employees/persons will not participate in the distribution: David Backus, Shawn Grygo, Shantel Magadanz, and Heather Heim. These individuals have been named as defendants in either this action and/or the related criminal case captioned *United States v. Shawn Grygo, et al.*, 24-cr-00337 (KMM-JFD), D. Minn.

The Receiver's proposed plan provides that all employees receive an equal pro rata share of the distribution amount based upon such employee's unpaid wages, as calculated by the MDLI and reviewed by the Receiver, subject to a payment cap of $3,000.00. If the Court approves the cap, 23 of 130 employees will be negatively impacted, in amounts ranging from $81.20 to $2,952.86. The Receiver believes implementing a cap is fair and reasonable. The majority of the employees entitled to back wages are lower-level hourly workers. A cap will provide lower earning individuals with a slightly higher recovery, based upon the understanding that such individuals are more dependent on their unpaid wages.

By limiting the total distribution amount to $250,000.00, the Receiver will reserve funds to make an additional distribution and to pay expenses, including fees charged by the payroll company to issue the employee checks and attorneys' fees of the Receiver.

Lastly, the Receiver has not conducted a thorough, independent analysis of the claimed back wages. Instead, in order to conserve the limited Receivership Funds, the

5

Receiver is relying on the MDLI's calculation of unpaid wages. The Receiver has, however, taken reasonable steps to confirm the accuracy of MDLI's list of employees and calculation of back wages. Given the state of the records of the Receivership Entities, the Receiver and others in her office have compared the calculations of MDLI with information available from Defendant Evergreen Recovery Inc.'s electronic business records and from the payroll company used by Evergreen Recovery Inc. to process employee payroll payments to ensure the completeness and accuracy of these calculations. The Receiver has had numerous conversations and written communications with both MDLI and the payroll processing company to discuss differences in the data and to ask questions. The Receiver has also reviewed written demands for payment that were submitted by employees for unpaid wages. Further, as a state agency, MDLI is authorized to conduct audits of unpaid wages and regularly does so. For all these reasons, and given that the unpaid wage claims are not being paid in full, the Receiver believes she can reasonably rely on MDLI's audit and resulting calculation of unpaid wages for purposes of the proposed partial distribution plan.

    Attached as Exhibit 1 to the Declaration of Ranelle Leier, filed herewith, is a spreadsheet listing each employee determined by the Receiver to be eligible to participate in the proposed distribution and the Receiver's calculation of proposed distribution amount to each such employee. Exhibit 1 contains two proposed distribution amounts for each employee – one with a $3,000 payment cap and one without any payment cap. To the extent approved by the Court, all payments will be processed through a payroll processing

6

company and will be less applicable FICA, federal, and state withholdings. Further, the checks will be mailed or delivered to the MDLI for distribution to employees.

In summary, the Receiver is seeking Court approval to implement the following partial asset distribution plan ("Partial Asset Distribution Plan"):

1. Authorize the Receiver to allocate $250,000.00 from the Receivership Funds for a partial distribution of unpaid employee back wages.

2. Authorize the Receiver to use the amounts set forth in Exhibit 1 to the Declaration of Ranelle Leier in the column labeled "Proposed Distribution – Capped" to calculate payments to the employees listed therein.

3. Authorize the Receiver to direct a payroll processing company to prepare checks for the employees listed on Exhibit 1 to the Declaration of Ranelle Leier, deducting applicable FICA, federal, and state withholdings.

4. Authorize the Receiver to deliver such checks to the MDLI for distribution to the listed employees.

## ARGUMENT

A.   **The Court has Broad Authority to Approve an Equitable Distribution Plan.**

District courts supervising federal equity receiverships have broad power and wide discretion to determine the appropriate procedures to administer the assets of and claims asserted against the receivership estate. *SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017); *SEC v. Hardy*, 803 F.2d 1034, 1037-38 (9th Cir. 1986); *see also SEC v. Infinity Group Co.*, 226 Fed. Appx. 217, 218 (3d Cir. 2007) ("District Courts have wide equitable discretion in fashioning distribution plans in Receivership proceedings, and we review the District

Court's order only for abuse of that discretion.") (citations omitted); *SEC v. Forex Asset Mgmt.*, LLC, 242 F.3d 325, 331 (5th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560, 1566-67 (11th Cir. 1992). When approving a distribution plan, the Court has the authority to approve any plan of distribution that is logical, fair, and reasonable. *See SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y 2009) (citing *SEC v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991)); *SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 670-71 (6th Cir. 2001). As explained by the court in *SEC v. Capital Consultants, LLC*:

> A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. The district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership. The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions.

397 F.3d 733, 738 (9th Cir. 2005) (citations omitted); *see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory role, and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership . . . .") (citations omitted).

"[T]he receiver's choice among allocation schemes [is] one within the discretion of the district court to approve or disapprove, like other aspects of the administration of a receivership. *SEC v. Huber*, 702 F.3d 903, 908 (7th Cir. 2012). The law recognizes that there are various methods used in pro rata distributions, and the method chosen may result in differing treatment of claimants. Further, in certain circumstances, a distribution plan may provide for reimbursement to certain claimants while excluding others. *Wang*, 944

8

F.2d at 84; *see also SEC v. Certain Unknown Purchasers of the Common Stock of and Call Options for the Common Stock of Santa Fe Int'l Corp.*, 817 F.2d 1018, 1020-21 (2d Cir. 1987), *cert. denied*, 484 U.S. 1060 (1988); *SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 660-61 (6th Cir. 2001).

B.   **Approval of the Receiver's Proposed Partial Asset Distribution Plan is Appropriate.**

The proposed Partial Asset Distribution Plan only includes employees as participants. Generally, as a group, the unpaid employees have incurred significant hardship because of the Receivership Entities' failure to pay wages. As part of its audit, employees reported numerous hardships to MDLI as a result of their unpaid wages. Some employees had to borrow money from friends and family to pay for basic living expenses. Others reported that they had to deplete savings, retirement accounts, or utilize credit cards to their maximums without the ability to pay the bill. Still others reported that they faced homelessness or were already homeless because they were unable to pay rent, or had to move in with family or friends. The Receiver recognizes that other creditors of the Evergreen Entities may have experienced similar impacts, but believes these impacts were borne more heavily by employees as a group. Further, even after the FBI raided Evergreen Recovery's offices and froze its bank accounts, some employees continued to work in order to transition clients of the Evergreen Entities to other service providers.

While this is not a bankruptcy case and bankruptcy principles do not apply, they are still instructive. In bankruptcy matters, unpaid wage claims are generally entitled to priority status over most other types of unsecured creditor claims. 11 U.S.C. § 507(a)(4).

Here, all unpaid wages were incurred in the 2-month period prior to appointment of the Receiver (the pay periods starting June 2, 2024 and ending August 10, 2024).

Here, the Receiver's proposed Partial Asset Distribution Plan will provide a fair, equitable, and efficient method for an initial asset distribution. Like many receiverships where fraud is alleged, insufficient funds exist to fully compensate all those impacted by the fraud and hard choices need to be made. While only employees will be allowed to participate in this first distribution, assets remain in the Receivership Funds for a potential additional distribution. The Receiver believes the Partial Asset Distribution Plan is appropriate given the limited funds available. Given that, at present, it is unlikely that significant additional funds will become part of the Receivership Funds, the Receiver does not believe there is any reason to delay a distribution further. The Court has discretion to authorize and approve the Receiver's Motion, and the Receiver respectfully requests that it do so.

### C. The Receiver Will Provide Notice of the Motion to Employees and Other Potential Claimants.

In the context of distribution plans, due process requirements generally include giving claimants adequate notice of the proposed plan, as well as an opportunity to be heard and present evidence. In order to comply with these requirements, the Receiver will use best efforts to provide notice of the Motion to employees of the Evergreen Entities, other potential claimants to the Receivership Funds. The Receiver will provide copies of the Motion and all supporting documents to the employees on Exhibit 1, including the date and time of the hearing. The Receiver will also provide this information to known vendors and

other creditors who have asserted claims of unpaid invoices and other moneys owed by the Receivership Entities. As part of the notice, the Receiver will inform employees and other claimants of the date of the hearing, the ability to provide written submission on the proposed Partial Asset Distribution Plan, and the opportunity to appear at the hearing and provide comments.

## **CONCLUSION**

For the reasons stated above, the Receiver respectfully requests that the Court enter an order:

1. Granting the Receiver's Motion in its entirety;

2. Approving the Receiver's proposed Partial Asset Distribution Plan;

3. Authorizing the Receiver to pay from the Receivership Funds a total of $250,000.00 pursuant to the proposed Partial Asset Distribution Plan in the amounts and to the employees set forth in Exhibit 1 to the Declaration of Ranelle Leier, filed herewith;

4. Granting any other relief as may be reasonable or appropriate in connection with the Motion.

Dated: October 3, 2025                          **FOX ROTHSCHILD LLP**

*/s/ Ranelle Leier*
Ranelle Leier
City Center
33 South Sixth Street
Suite 3600
Minneapolis, MN 55402
Tel:  612.607.7000
Fax:  612.607.7100
rleier@foxrothschild.com
Receiver for Evergreen Recovery Inc., Evergreen Mental Health Services Inc., Ethos Recovery Clinic Inc., Second Chances Recovery Housing Inc., Second Chances Sober Living, Inc.