# EXHIBIT 1



November 5, 2025

Honorable Kate M. Menendez
United States District Court, District of Minnesota
Courtroom 14W
300 South Fourth Street
Minneapolis, MN 55415

Re:   Court File No. 24-cv-2944
      DLI File No. ICR-202400086

Dear Judge Menendez:

The Minnesota Department of Labor and Industry, Labor Standards Division ("MNDLI") submits this letter to the Court in support of the Receiver's Motion for Partial Distribution of Receivership Funds ("Motion") in the above-referenced matter.

## INTRODUCTION

MNDLI determined that the Receivership Entities committed wage theft by failing to pay their employees the wages they earned from their labor. The personal cost to the Receivership Entities' workers, especially those that are low-wage workers, has been devastating, and the impact extends beyond these individuals to their families and the greater community due to the work that they performed. While workers have pathways to address wage theft under state and federal wage and hour laws, including with the assistance of government agencies such as MNDLI, many workers are left without recourse when employers such as the Receivership Entities unlawfully keep their workers' wages for their own interests and hide behind subsequent insolvency.

Fortunately, in this matter, there is a route to address some of the Receivership Entities' wage and hour violations. The Court has the opportunity and discretion to grant the Receiver's Motion, which proposes to pay workers a portion of their wages earned from 2024. MNDLI supports the Receiver's Motion and asks the Court to grant the Motion because MNDLI's investigatory process and calculation of back wages was fair and accurate, and worker payments should be prioritized because they were misled by the Receivership Entities and suffered significant hardship.

# MNDLI'S INVESTIGATION

### *MNDLI's Jurisdiction to Investigate the Receivership Entities*

Minnesota mandates that employers pay employees for their work. *See* Minn. Stat. § 181.101(a). The Minnesota Legislature gave MNDLI broad authority to investigate "facts, conditions, practices or matters as the commissioner deems appropriate to enforce the laws within the commissioner's jurisdiction," including labor standards and the payment of wages. Minn. Stat. § 175.20. MNDLI may "examine and inspect books, registers, payrolls, and other records of any employer that in any way relate to wages, hours, and other conditions of employment of any employees." Minn. Stat. § 177.27, subd. 1. In addition, the Commissioner "may require the employer of employees working in the state to submit to the commissioner photocopies, certified copies, or, if necessary, the originals of employment records which the commissioner deems necessary or appropriate." Minn. Stat. § 177.27, subd. 2.

Not all businesses maintain sufficient or exact records. MNDLI must determine, after reviewing the available information, whether proper wages have been paid. The Legislature recognized this fact and specifically gave MNDLI the power to do so. "If the records maintained by the employer do not provide sufficient information to determine the exact amount of back wages due an employee, the commissioner may make a determination of wages due based on available evidence and mediate a settlement with the employer." Minn. Stat. § 177.30, paragraph (d).

### *MNDLI's Investigation of the Receivership Entities*

MNDLI initiated an investigation of Evergreen Recovery Inc. on July 23, 2024 in response to several complaints regarding Evergreen's failure to pay wages to employees. MNDLI expanded the investigation to include Evergreen Mental Health Services Inc., Ethos Recovery Clinic Inc., Second Chances Sober Living, Inc. ("Receivership Entities"), David Backus, individually (Defendant Backus) and Shawn Grygo, individually (Defendant Grygo).[1] During the investigation, MNDLI gathered information from 138 employees of the Receivership Entities and Defendants, as well as some limited documentation from Defendants, including bounced checks and earnings statements issued to employees for amounts the employees were never able to cash.

MNDLI served the Defendants and the Receivership Entities with a Demand for Submission of Records on July 16, 2024, but no responsive records were provided prior to MNDLI issuing the Compliance Order. Most of the evidence MNDLI obtained in this investigation came from employees and not directly from the employers, despite MNDLI's efforts to secure records from the Receivership Entities and Defendants.

---

[1] MNDLI's investigation included all the Receivership Entities except for Second Chances Recovery Housing Inc. because Second Chances did not appear to have employees. MNDLI's investigation also included Defendant Grygo and Defendant Backus, who are not part of the Receivership Entities.

Pursuant to Minn. Stat. § 177.30, paragraph (d), which as noted above allows MNDLI to make a determination of wages due based on available evidence, MNDLI determined back wages owed by:

- interviewing each of the Receivership Entities and Defendants' 138 employees and reviewing documents they provided;
- analyzing reports of missing pay checks for each employee, accompanied by the number of hours owed on each paycheck, their regular rate of pay, and any additional wages earned; and
- reviewing records obtained from various sources during the investigation, including earning statements and/or time tracking records for the June 24, July 10, and July 24, 2024 pay dates, images of checks written by Defendant Grygo, emails to staff from Defendants Grygo and Backus, audio recordings of Defendants Grygo and Backus, documentation of returned checks, and other records to confirm the information reported by the employees.

Based on the above evidence, MNDLI issued a Compliance Order pursuant to Minn. Stat. § 177.27, subd. 4 and 7 against the Defendants and the Receivership Entities. The Compliance Order found back wages earned and unpaid of $1,216,404.87 between June 2, 2024 and August 10, 2024, as well as compensatory damages of $22,183.32, average daily earnings penalties of $601,855.40, and liquidated damages of $1,216,404.87.  MNDLI later amended its statement of back wages and statement of damages and penalties to include back wages and liquidated damages of $1,160,956.85, compensatory damages of $7,050.63, and average daily earnings penalties of $582,817.40.

Following issuance and service of the Compliance Order, Defendants timely served an objection to the Order, but did not contest that wages were due to their employees. Defendants' objection was not specific but instead stated that they did not have access to business records, were unable to verify the amounts owed to the employees and confirmed that they would pay the employees if allowed access to their accounts.

The next step in MNDLI's process is to refer the case for a contested case proceeding at the Court of Administrative Hearings (CAH). MNDLI often attempts settlement with employers prior to referring a contested case for hearing. In this case, MNDLI discussed the case with the Receivership Entities and Defendants, but because their bank accounts were frozen, meaningful settlement discussions were not possible. Even so, MNDLI is awaiting the outcome of the proceedings in this matter before referring this matter to the Minnesota Attorney General's Office (AGO) to represent MNDLI in a contested case at CAH.  If the amounts due to employees change as a result of this matter, MNDLI would amend its statement of back wages and statement of damages and penalties owed prior to transferring its file to the AGO.

## EMPLOYEES SHOULD GET PRIORITY FOR PAYMENT OF THEIR WAGES

The employees in this case are entitled to payment of wages as a substantive right. *See* Minn. Stat. §181.101. Moreover, the Compliance Order sets out real damages to individual workers who were not paid wages for hours worked and suffered as a result. In contrast to other types of creditors, the employees were in a significantly worse bargaining position – the Receivership Entities and Defendants were these workers' employers and held all the power in the relationship. The Receivership Entities and Defendants misled their employees into continuing to work despite a lack of pay by promising to pay them and capitalizing on their sense of duty and care to the clients they served. Many employees faced significant economic hardships as a result.

### *Defendants and the Receivership Entities Continually Misled Employees So They Would Continue to Work Without Pay*

The evidence MNDLI reviewed indicates the Receivership Entities' and Defendants' financial issues began before MNDLI's investigation period of May 1, 2024 to August 6, 2024 ("Audit Period"). During MNDLI's Audit Period, Defendants repeatedly told employees not to be concerned about their wages and to remember that the employees owed a duty of care to the clients. Between the middle and end of July 2024, Defendant Grygo sent near-daily emails to employees promising that the pay issues would be resolved and employees would be paid within days without issue. Defendant Grygo provided employees several explanations for the Receivership Entities' and Defendants' failure to pay wages and denied that the Receivership Entities and Defendants lacked the funds to pay wages. Because some employee paychecks did clear during this time it led many other employees to accept the Receivership Entities and Defendants' statements that wages would be paid to everyone.

During a recorded mandatory staff meeting on July 24, 2024, the Receivership Entities and Defendants again reminded employees they had a duty of care to the clients, stated that the pay issues were resolved, and implied employees were selfish for badgering the Receivership Entities and Defendants about unpaid wages. The Receivership Entities and Defendants then misled additional employees by hiring new employees in the days leading up to an FBI raid of the Receivership Entities in late July 2024. Some employees reported being asked to continue to work following the raid. In sum, the employees, particularly those paid at a lower rate and in non-executive level positions, relied on statements made by the Receivership Entities and Defendants, and the Receivership Entities and Defendants took advantage of the employees' reliance in order to keep employees working without pay.

### *Employees Suffered Unique Hardships Because of the Receivership Entities' and Defendants' Actions*

Many of the Receivership Entities' and Defendants' former employees provided statements to MNDLI describing the hardships they experienced as a direct result of not being paid their wages for hours worked, including needing to borrow money from family and friends,

maxing out credit cards, and taking out loans. Some employees reported postponement of major events, such as weddings, honeymoons, and home purchases. Finally, employees reported significant mental health impacts. These immediate impacts significantly affected the lower-income employees who were most reliant on a consistent paycheck to keep up with their costs of living.

Employees have continued to provide statements to MNDLI describing the lasting impacts of the Receivership Entities' and Defendants' failure to pay their wages, including:

- One employee was forced to take out a loan and borrow money from friends to pay bills, including medical bills from cancer treatments.
- Two employees' credit scores dropped over 100 points, and they were not able to afford food, or medical or car insurance. The financial strain caused them both anxiety and depression, but they could not afford to seek treatment.
- One employee was served with eviction paperwork, which was especially stressful for them because their family had been previously homeless. They applied for assistance but the county was unable to communicate with the Receivership Entities to confirm wages and the assistance was denied. They took on more than $10,000 in debt to pay for items between July and October of 2024, including day care charges.
- One employee was the sole breadwinner in their family; their partner is disabled and they have a toddler at home. Their savings are now depleted.

## EVEN WITH PRIORITY, EMPLOYEES WILL NOT BE MADE WHOLE

If the Court approves the plan as outlined by the Receiver, the employees will still only receive a percentage of what they are owed in back wages and none of the damages assessed by MNDLI in its investigation. When MNDLI issues a Compliance Order to pay unpaid wages, Minn. Stat. §177.27 requires the Order include liquidated damages equal to unpaid wages and allows for inclusion of compensatory damages and civil penalties. The Receiver's plan does not include all wages or any of these additional damages or penalties normally used to bring employees closer to whole. While these employees will only get a portion of the money they are owed for the hours they worked and will not be compensated for the financial and emotional impact that the Receivership Entities' and Defendants' failure to pay wages has had on them, MNDLI urges the Court to grant the Receiver's Motion to begin to compensate these employees. MNDLI also hopes the Court will consider future disbursements to these employees who put their livelihoods on the line to help the clients the Receivership Entities and Defendants abandoned.

## CONCLUSION

MNDLI supports the Receiver's Motion as the most logical, fair, and reasonable means to support the employees who have been impacted by the Receivership Entities' and Defendants' continued false promises that employees would be paid their full wages. MNDLI

respectfully requests the Court use its discretion to assist as many low-income workers as possible who have suffered significant consequences as a result of the Receivership Entities' and Defendants' violations of Minnesota labor laws.

Sincerely,

Jessica Grosz
Director, Division of Labor Standards
Minnesota Department of Labor and Industry